# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | |
|---|---|
| JOLYN McDONALD, ) | |
|  ) | |
|  Plaintiff, ) | No. 05-4056 |
|  ) | |
| v. ) | |
|  ) | |
| BEST BUY COMPANY, INC., ) | |
|  ) | |
|  Defendant. ) | |

## O P I N I O N  A N D  O R D E R

Before the Court is Defendant's Motion for Summary Judgment (Doc. 21). Plaintiff has filed a Response (Doc. 23) and an accompanying Memorandum (Doc. 24). Defendant has also filed a Reply (Doc. 28). Plaintiff has brought suit against Defendant alleging a violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq*. For the following reasons, Defendant's Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART.

### I.
### BACKGROUND

In 1986, Plaintiff, Jolyn McDonald, was hired by Defendant, Best Buy Stores, L.P. ("Best Buy").[1] She advanced through Best Buy for over seventeen years and in 2003 was made the Customer Service Manager at the Best Buy store in Moline, IL.

---

[1] Defendant notes that Plaintiff has brought suit against "Best Buy Company, Inc." instead of "Best Buy Stores L.P.". However, Defendant does not suggest that this error is dispositive of this case or requires a remedy in order for this suit to go forward.

As the Customer Service Manager, she was responsible for accurate processing of all of Defendant's customer transactions, managing all aspects of store operations, motivating and training staff, and ensuring profitability through the correct use of the store's systems and processes. (Doc. 21 at 2; Doc. 23 at 2.)

In March of 2004, when Plaintiff was fifty-four years old, Defendant instituted a company-wide transformation in which the Company's business model changed from being product-focused to being customer-focused. (Doc. 21 at 3.) The new customer-centric model was known in the company as "LTS" ("Leadership, Training, and 'Standard Operating Platform'."). According to Defendant, Plaintiff's position was particularly impacted by the new business model because the Customer Service Manager was given the additional responsibilities of tracking in-home service and conducting increased coaching and training of employees. (Doc. 21 at 3.)

Prior to that time, Plaintiff had an exceptionally strong performance history with Best Buy and had received positive performance reviews up until March of 2004. (Doc. 23 at 8-9.) According to Defendant, after the LTS model was introduced, the company found that "more tenured" employees were having a harder time adapting to the changes. Specifically, employees who had "been around for a while" found that "it was a hard change" because the new process was "completely different from anything [Best Buy] had done before." (Stald Depo. at 162.)

According to Defendant, Plaintiff appeared to have problems adjusting to the LTS model and on May 18, 2004, she received her first written warning or

2

'performance improvement plan' ("PIP"). (Doc. 23 at 12.) Shortly after that Steve Patton, the Moline store manager, suggested that Plaintiff step down to spend more time with her grandchildren. (Plaintiff Depo. at 115.)

Mark Stanley, the district operations manager, also spoke with Plaintiff around May of 2004 and warned Plaintiff that older employees were going to have a hard time adjusting to the changes. Furthermore, Stanley informed Plaintiff that if she did not successfully complete her performance improvement plan then termination was a definite possibility. (Doc. 23 at 13.) However, before the end of August, Plaintiff was taken off of the PIP and no disciplinary action was taken against Plaintiff. (Doc. 23 at 13.)

In August of 2004, Patton was replaced with a new store manager, Ed Stald. Stald began referring to Plaintiff as "Grandma," "Grandma Jo," or "Grandma Jolyn," in front of both subordinates and superiors and continued to refer to Plaintiff as Grandma over the next month. (Doc. 23 at 14-15.) According to Plaintiff, Stald also bragged at the initial meeting with store managers that he could fire any employee "with documentation." (McDonald Aff. at 4.) Also at the initial meet, Stald told his managers that everyone would be given a "clean slate."

Shortly after the initial meeting, Stald placed Plaintiff back onto a PIP. According to Plaintiff, Stald did not regularly work in the Moline store through the month of August because he was still working at the store in Des Moines and because he was in the process of moving to Moline. As a result, when Stald placed

3

Plaintiff on a PIP he had not yet met with her or had any occasion to work with her. (Doc. 23 at 16.)

Plaintiff also places an inordinate amount of emphasis on a plausible act of courtesy by Stald that occurred around that time. According to Plaintiff, Stald offered Plaintiff a stool to sit on during one of her twelve hour shifts. According to Plaintiff, personnel were not allowed to sit on stools during their shift and this was an act of age discrimination.

According to Defendant, Plaintiff experienced performance problems during the month of September. Defendant points out in their brief that Plaintiff received two written Performance Counseling Records ("PCRs") on September 16. These PCRs reprimand Plaintiff for failing to live up to the expectations of the new business model and they contain amorphous criticism like Plaintiff failed to "influence and inspire" her subordinates. However, Defendant's brief does not specifically explain what Plaintiff did wrong to merit the PCRs. Likewise, Defendant's brief refers to multiple negative written citations that Defendant received, but never actually explains the citations or describes any actions on Plaintiff's part that fell short of expectations. (Doc. 21 at 14-17.)

Around that time, Plaintiff was also informed that due to her seniority, the company had higher expectations for her. Defendant expected Plaintiff's "profit levers" to be ranked in the Company's "top tritile" – or among the top two hundred stores. Specifically, Defendant states that "due to Plaintiff's 16 years of experience" she was expected to be in the "top tritile." (Doc. 21 at 3.)

4

Plaintiff remained on the PIP until October of 2004 when Plaintiff went on a six day vacation for her son's wedding. When she returned, she received a back-dated letter regarding her inability to effectively manage labor. (Doc. 23 at 21.) According to Stald, while Plaintiff was on vacation, four employees made errors which her staff could not handle. Her supervisors then informed Plaintiff that she was being demoted two grades for her failure to manage labor. (Doc. 23 at 17.) Rather than accept the demotion, Plaintiff left her employment and she was replaced by a twenty-eight year old employee. She has now brought suit alleging age discrimination.

## II.
## LEGAL STANDARD

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party has the responsibility of informing the Court as to portions of the record that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The movant may meet this burden by demonstrating "that there is an absence of evidence to support the nonmoving party's case." Id. at 325.

Once the movant has met its burden, to survive summary judgment the "nonmovant must show through specific evidence that a triable issue of fact remains on issues on which [s]he bears the burden of proof at trial." Warsco v. Preferred

Tech. Group, 258 F.3d 557, 563 (7th Cir. 2001); See also Celotex Corp., 477 U.S. at 322-24. "The nonmovant may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits; it must go beyond the pleadings and support its contentions with proper documentary evidence." Chemsource, Inc. v. Hub Group, Inc., 106 F.3d 1358, 1361 (7th Cir. 1997).

This Court must nonetheless "view the record and all inferences drawn from it in the light most favorable to the [non-moving party]." Holland v. Jefferson Nat. Life Ins. Co., 883 F.2d 1307, 1312 (7th Cir. 1989). In doing so, this Court is not "required to draw every conceivable inference from the record -- only those inferences that are reasonable." Bank Leumi Le-Isreal, B.M. v. Lee, 928 F.2d 232, 236 (7th Cir. 1991). Therefore, if the record before the court "could not lead a rational trier of fact to find for the non-moving party," then no genuine issue of material fact exists and, the moving party is entitled to judgment as a matter of law. McClendon v. Indiana Sugars, Inc., 108 F.3d 789, 796 (7th Cir. 1997) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). However, in ruling on a motion for summary judgment, the court may not weigh the evidence or resolve issues of fact; disputed facts must be left for resolution at trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).

## III.
## ANALYSIS

In this case, Plaintiff's claim survives under the direct method of proving discrimination. Under the Age Discrimination in Employment Act ("ADEA"), it is unlawful for any employer to "discharge any individual or otherwise discriminate

against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). This protection is available to individuals who are at least 40 years old. 29 U.S.C. § 631(a).

A Plaintiff may establish an ADEA claim through either the direct or indirect methods of proof. Hemsworth v. Quotesmith.com, Inc., 476 F.3d 487, 490 (7th Cir. 2007); Ptasznik v. St. Joseph Hosp., 464 F.3d 691, 695 (7th Cir. 2006). Our appellate court has noted that because such a plaintiff may utilize circumstantial evidence under both methods of proof, "[t]he distinction between the two avenues of proof is 'vague,' and the terms 'direct' and 'indirect' themselves are somewhat misleading in the present context." Faas v. Sears, Roebuck & Co., 532 F.3d 633, 641 (7th Cir. 2008). The direct method of proof involves direct evidence, such as near-admissions by the employer, as well as more attenuated circumstantial evidence that "suggests discrimination albeit through a longer chain of inferences." Hemsworth, 476 F.3d at 490 (quoting Luks v. Baxter Healthcare Corp., 467 F.3d 1049, 1052 (7th Cir. 2006). In contrast, the indirect method of proof involves a certain subset of circumstantial evidence that includes how the employer treats similarly situated employees, and "conforms to the prescription of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, (1973)." Id. at 490-491.

In the case at bar, it is necessary to first reject the superfluous evidence which Plaintiff attempts to bring into this case. First, Plaintiff points to Patton's suggestion that she step down and spend more time with her grandchildren. For a

7

court to consider a stray remark as evidence of discrimination, the comment must be made by a decision maker. Merillat v. Metal Spinners, Inc., 470 F.3d 685, 694 (7th Cir. 2006). However, Plaintiff acknowledges that Patton left Best Buy long before her demotion. Thus, he could not have been involved in her demotion and is not relevant to the inquiry before the Court.

Next, Plaintiff emphasizes Stald's comment that everyone would be given a "clean slate." Plaintiff alleges that this comment was a lie. Soon after Stald told his employees that they would be given a "clean slate," Stald placed Plaintiff on a PIP before he began working full time at the Moline Store and before he had a chance to properly evaluate Plaintiff. According to Plaintiff, she was never given a "clean slate." While this does suggest that Stald may have been less than truthful in his promise to his new employees, it does not suggest that Stald was motivated by any age related bias.

Finally, Plaintiff emphasizes the fact that Stald offered Plaintiff a stool to sit on while she was working a twelve hour shift. Plaintiff argues that because regular employees were not allowed to sit on stools, Stald's offer was an example of inimical age discrimination. However, simply because Stald was willing to drift outside Defendant's internal regulations to make a courteous gestures does not mean that Defendant had an insidious discriminatory intent as a prelude to her later demotion. For example, the record before the Court states that employees are allowed to sit on a stool if they are pregnant or have a doctor's excuse. (Doc. 23 at 4.) This corporate guideline is not a policy of inimical discrimination against the

8

pregnant or the infirm. This policy allows for *increased* employment opportunities for pregnant or infirm individuals. Likewise, Stald's courteous extension of Defendant's policy to offer Plaintiff a stool, even if it was because of her age, is not necessarily an example of inimical discrimination and it does not shed any light on whether Stald had a discriminatory intent when Plaintiff was later demoted.[2] Nevertheless, despite this specious argument, there is still enough evidence in the record for Plaintiff to survive summary judgment.

As already noted, for a plaintiff to survive summary judgment under the direct method of proof, she must either present near-admissions from the defendant or circumstantial evidence demonstrating intentional discrimination. Hansworth, 476 F.3d at 491. In the case at bar, there is no admission or near-admission from Defendant. Therefore, this Court must look at the circumstantial evidence to determine if the record demonstrates a genuine issue of material fact. Circumstantial evidence demonstrating intentional discrimination includes: "(1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; and (3) evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination." Sun v. Board of Trustees of Univ. of Illinois, 473 F.3d 799, 812 (7th Cir. 2007).

---

[2] Furthermore, this Court is not about to encourage a legal regime which discourages courteous behavior such as this.

9

In the case at bar, Plaintiff was replaced by an employee who was only twenty-eight. This alone is not enough to survive a motion for summary judgment. See, e.g., Ragland v. Rock-Tenn Co., 955 F.Supp. 1009, 1022 (N.D. Ill. 1997). However, Plaintiff is able to point to several events that occurred around the same time: (1) Plaintiff was nicknamed "Grandma;" (2) a new business model was put in place that led to demotions and terminations for older employees; and (3) Defendant held Plaintiff to substantially more demanding standards because of her seniority. Defendant would like this Court to focus instead on the disciplinary documentation in the record. However, the disciplinary documentation could be considered unreliable and pretextual because Defendant has not adequately explained the documentation and because of statements by Stald. Each of these facts alone would never be enough to survive summary judgment, but when considered in combination, they present a mosaic that could convince a jury that Plaintiff's termination was the product of a new corporate culture geared toward putting older employees out to pasture.

First, Stald labeled Plaintiff "Grandma" soon after his arrival and after the Company adopted the new policies. Defendant responds to this contention with an absurd argument. According to Defendant, "Grandma" is not an age based comment because it is technically possible for a person to be under the age of forty (and not protected by the ADEA) and still be a grandparent. According to Defendant, because it is possible for a grandparent to be outside of the protected class, the term "Grandma" is not an age related nickname and should be

10

disregarded. However, Defendant's argument does not stand the test of logic. For example, racial epithets are used in a wide variety of contexts and do not always refer to a protected class under Title VII. Simply because a racial epithet could be used to refer to a person outside of a protected class does not mean that a racial epithet is not race related and is acceptable in the workplace. What matters is the commonly accepted meaning of the word. In this case, a woman who is labeled "Grandma" is unquestionably labeled with the moniker because of her age or personal characteristics popularly associated with persons of an older generation. However, "Grandma" is not as socially unacceptable or demeaning as many derogatory epithets based upon race or gender. Alone, the nickname would never be enough to bring a successful claim under the ADEA. Nevertheless, in the workplace, calling someone "Grandma" does suggest ageism.

Shortly before Stald arrived, Defendant also adopted a new business model that was particularly challenging to older employees. Defendant argues that it was not necessarily "older" employees who were having trouble, just "more tenured" employees who were having trouble under the new corporate policy. According to Defendant, the policy had nothing to do with age. Instead, "more tenured" employees were simply set in their ways and had more difficulty adapting to the new system. However, this Court is suspicious of Defendant's semantical argument. Defendant presented no evidence of older employees who survived the new policy because they were less tenured and had not grown accustomed to the new business model. Furthermore, it stands to reason that as an employee becomes

11

"more tenured" they become older and older employees are far more likely to be "more tenured" than younger employees.  In short, this Court is suspicious because a business model that results in the demotion or termination of "more tenured" employees is an effective artifice to push older employees out the door.

      Nevertheless, the new business model alone would not be enough for Plaintiff to survive summary judgment.  However, Plaintiff was also informed around the same time that because of her seniority, her "profit levers" were expected to be among the "top-tritile" in the company.  (Doc. 21 at 3.)  Unfortunately, Defendant never explains this piece of evidence except to state that Plaintiff was expected to be among "the top two-hundred in the company."  However, without some guidance as to whether Defendant was referring to the top two-hundred 'stores,' 'managers,' or 'employees,' this performance goal is too ethereal for assessment by the Court.  More importantly, Defendant never provides the denominator in the equation.  That is to say, Defendant never states if Plaintiff was expected to be among the top two hundred out of five hundred stores, or among the top two hundred out of five thousand employees.  Furthermore, Defendant never describes what are meant by "profit levers" and as a result, there is no way for this Court to analyze this heightened standard of job expectations for Plaintiff.  Without a proper explanation or some guidance from Defendant, this Court must assume that Plaintiff was placed on a much more demanding standard simply because of her seniority, a convenient euphemism for her age.

Stripped of all semantical window dressing, the record before the Court shows that Defendant adopted a new business model that led to older employees being fired.  At the same time, Defendant brought in a new store manager who quickly labeled Plaintiff "Grandma."  And finally, around the same time, Defendant placed Plaintiff on a much more demanding standard simply because of her seniority.  A jury could look at these three facts and conclude that age became a focus of this stores corporate culture and age was a determining factor in the decision to demote her.

Defendant would like this Court to take a harder look at the disciplinary documentation provided in the record.  However, based upon the briefing and the record before the Court, the disciplinary documentation appears less than reliable.  First, the only actual underlying failure described by Defendant is Plaintiff's failure to be in the top tritile described *supra*.  Other than that, Defendant provides neither evidence nor an explanation for the disciplinary documentation.  (Doc. 21 at 14-17)  This Court would give an employer wide latitude to enforce business decisions or internal regulations, even if they are poor business decisions.  See, e.g., Perez v. Colwell Systems, Div. of Deluxe Corp., 83 F.Supp.2d 976, 985).  However, Defendant never describes what Plaintiff did that ran contrary to Defendant's internal regulations.  Defendant simply cites the disciplinary documentation itself and does not explain the documentation or cite any testimony that establishes what Plaintiff did wrong.  For example, Defendant cites the PCR and the PIP that Plaintiff received on September 16, 2004.  According to Defendant, the PIP contains

"even greater detail about how McDonald's performance needed to improve."  (Doc. 21 at 16 citing UMF ¶ 28.)  However, the PIP that supposedly contains "more information" only states that "[Plaintiff's] behaviors [are] not being aligned with the companies [sic] transformation and values." (Doc. 21 at 6, ¶ 28.)  Even the underlying material cited by Defendant, which this Court should not need to delve into, does not provide any detail regarding what Plaintiff did wrong.  Petts v. Rockledge Furniture LLC, 534 F.3d 715 n. 1 (7th Cir. 2008) ("judges are not like pigs, hunting for truffles buried in the record.").  As a result, this Court has no evidence or explanation to rely upon that might explain what mistakes Plaintiff might have made that would merit the disciplinary documentation.

     Second, viewing the facts in the light most favorable to Plaintiff, this Court must view the documentation with some suspicion.  The disciplinary documentation was prepared by Stald.  However, Stald bragged to his managers that he could fire any employee within two weeks "with documentation."  Disciplinary documentation is usually a means for an employer to accurately record errors by an employee so they do not need to rely solely upon personal recollections of often disputed events.  However, documentation can serve a more malevolent purpose of 'covering up' a discriminatory intent.  Stald's comment that he could fire anyone with documentation suggests that he did not view documentation as a means of keeping an accurate record.  Furthermore, Stald prepared at least some of the disciplinary documentation before he had a chance to properly evaluate Plaintiff.  (Doc. 23 at 16.)  This does not suggest that Stald prepared documentation to accurately record

14

errors made by Plaintiff; rather, it suggests that Stald was simply laying a record to cover any other reason he might have for terminating Plaintiff. If Defendant is unable to point to what Plaintiff did wrong at trial, then a reasonable jury could look at Stald's statements and actions and conclude that the disciplinary documentation is less than reliable and is simply a pretext for Plaintiff's ultimate termination.

Accordingly, based on the cursory briefs before the Court that did not delve into the relevant facts, Plaintiff has presented a viable claim. Plaintiff has come forward with suspicious timing and with ambiguous comments directed at her protected group. There is also evidence that similarly situated employees outside the protected class received systematically better treatment because they were not held to a heightened standard. And, a reasonable jury could conclude that Defendant was laying a pretextual record for her ultimate demotion. Hemsworth, 476 F.3d at 490; Sun, 473 F.3d at 812. These combined elements present a convincing mosaic that her age was a determinative factor in a corporate culture that was intended to clean out older individuals.

## IV.
## ADDITIONAL ISSUES

Plaintiff's Complaint contains two counts. Plaintiff's second count lists additional facts which suggest an age harassment claim. However, Count II does not provide a specific statute or legally cognizable cause of action. Defendant attempts to address Plaintiff's poorly organized Complaint and argues that if Plaintiff is seeking an age harassment claim, then such a claim should be

15

dismissed. Plaintiff does not address Defendant's arguments regarding Count II and does not offer an explanation for Count II. Accordingly, Plaintiff has not provided a legal basis for Count II and as a result it is DISMISSED.

## V.
## CONCLUSION

IT IS THEREFORE ORDERED that Defendant's Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART. Count II of Plaintiff's Complaint is DISMISSED. The Motion for Summary Judgment is DENIED in all other respects.

ENTERED this  27th  day of August, 2008.

s/Joe Billy McDade
Joe Billy McDade
United States District Judge
